UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **Students for Life of America**, et al., | Case No. 1:24-cv-11928 |
| Plaintiffs, | Judge Jeffrey I. Cummings |
| v. | |
| **Ann Gillespie**, et al., | |
| Defendants. | |

**PLAINTIFF'S RESPONSE TO THE DEFENDANTS' MOTION TO
DISMISS THE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

Table of contents............................................................................................. i

Table of authorities........................................................................................ ii

I.  The plaintiffs have alleged Article III standing ....................................... 1

    A.  The plaintiffs have alleged that their injuries will likely be redressed by the requested relief.......................................................................... 2

    B.  The plaintiffs have alleged that their injuries are fairly traceable to the Acting Director's enforcement of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60 ................................................................................................ 14

    C.  The plaintiffs have standing to sue for nominal and compensatory damages....... 15

II. The plaintiffs have a private right of action enforce their statutory preemption claims ......................................................................................... 15

    A.  The plaintiffs may sue under 42 U.S.C. § 1983 to enforce the Coates–Snowe amendment, the Weldon amendment, and the Religious Freedom Restoration Act ......................................................................... 16

    B.  The plaintiffs may sue under *Ex Parte Young* to enforce the Comstock Act, the Coates–Snowe amendment, the Weldon amendment, And the Religious Freedom Restoration Act ................................................... 20

    C.  The plaintiffs may sue under the Declaratory Judgment Act to enforce the Comstock Act, the Coates–Snowe amendment, the Weldon amendment, and the Religious Freedom Restoration Act....................................... 23

III. The State's enforcement of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60 is preempted by the Comstock Act, the Coates–Snowe amendment, the Weldon amendment, and the Religious Freedom Restoration Act .............................. 24

    A.  The Comstock Act ..................................................................... 24

    B.  The Weldon amendment ............................................................ 26

    C.  The Coates–Snowe amendment................................................... 27

    D.  The Religious Freedom Restoration Act ....................................... 27

IV. The plaintiffs have alleged a violation of their free-exercise rights ........ 28

    A.  The exemptions in 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60 defeat any claim that the abortion-coverage laws are "generally applicable" ......... 29

    B.  Plaintiffs Midwest Bible Church, Pro-Life Action League, and Illinois Right To Life have alleged a hybrid-rights claim that renders *Oregon v. Smith* inapplicable ............................................................................ 32

Conclusion...................................................................................................... 35

## TABLE OF AUTHORITIES

**Cases**

*American Insurance Ass'n v. Garamendi*, 539 U.S. 396 (2003)........................................ 21

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015) ..................... 16, 20, 21

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).............................................................................. 12

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................... 12

*Bours v. United States*, 229 F. 960 (7th Cir. 1915) .......................................................... 25

*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) ....................................................... 34

*Brown v. Board of Education*, 349 U.S. 294 (1954)............................................................ 5

*Brown v. Plata*, 563 U.S. 493 (2011)................................................................................... 5

*Cedar Park Assembly of God of Kirkland Washington v. Kreidler*,
130 F.4th 757 (9th Cir. 2025) ........................................................................................ 13

Cedar *Park Assembly of God of Kirkland, Washington v. Kreidler*,
683 F. Supp. 3d 1172 (W.D. Wash. 2023)................................................................ 30, 31

*Cedar Park Assembly of God of Kirkland, Washington v. Kreidler*,
860 Fed. Appx 542 (9th Cir. 2021)................................................................................ 12

*Center for Auto Safety v. National Highway Traffic Safety Administration*,
793 F.2d 1322 (D.C. Cir. 1986)....................................................................................... 1

*Christopher v. Harbury*, 536 U.S. 403 (2002) ................................................. 1, 10, 13, 34

*City of Boerne v. Flores*, 521 U.S. 507 (1997)...................................................... 19, 27, 28

*Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752 (7th Cir. 2003)......... 32

*Department of Commerce v. New York*, 588 U.S. 752 (2019).......................................... 14

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022).............................. 14

*Douglas v. Independent Living Center of Southern California, Inc.*,
565 U.S. 606 (2012)....................................................................................................... 22

*Doe v. Holcomb*, 883 F.3d 971 (7th Cir. 2018)................................................................. 22

Edgewood Manor Apartment Homes, LLC v. RSUI Indemnity Co.,
733 F.3d 761 (7th Cir. 2013).......................................................................................... 24

*Employment Division, Department of Human Resources of Oregon v. Smith*,
494 U.S. 872 (1990)................................................................................................... 28, 32

*Ex parte Young*, 209 U.S. 123 (1908)................................................................. 16, 20, 22

*Federal Election Commission v. Ted Cruz for Senate*, 596 U.S. 289 (2022) ........................ 3

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) ............................................. 29, 31, 32

*Gonzaga University v. Doe*, 536 U.S. 273 (2002) ............................................................. 16

*Haney v. County Board of Education of Sevier County*, 429 F.2d 364 (8th Cir. 1970)......... 4

*Health and Hospital Corporation of Marion County v. Talevski*,
    599 U.S. 166 (2023)................................................................................................. 16, 18

*Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*,
    585 U.S. 878 (2018)....................................................................................................... 19

*Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*,
    422 F.3d 490 (7th Cir. 2005)........................................................................................... 6

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) ......................................................... 19

*Madej v. Briley*, 371 F.3d 898 (7th Cir. 2004) ................................................................. 4

*Maine v. Thiboutot*, 448 U.S. 1 (1980)............................................................................. 19

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)......................................................... 9

*McDaniel v. Board of Education of City of Chicago*,
    956 F. Supp. 2d 887 (N.D. Ill. 2013)............................................................................. 7

*Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*,
    453 U.S. 1 (1981) ......................................................................................................... 18

*Obergefell v. Hodges*, 576 U.S. 644 (2015) ...................................................................... 5

*Orangeburg, South Carolina v. FERC*, 862 F.3d 1071 (D.C. Cir. 2017)........................... 2

*Osborn v. Bank of United States*, 22 U.S. (9 Wheat.) 738 (1824) ................................... 20

*Pavlock v. Holcomb*, 35 F.4th 581 (7th Cir. 2022)............................................................ 8

*Planned Parenthood of Indiana, Inc. v. Commissioner of the Indiana State*
    *Dep't of Health*, 699 F.3d 962 (7th Cir. 2012).......................................................... 22

*Priests For Life v. U.S. Dep't of Health and Human Services*,
    772 F.3d 229 (D.C. Cir. 2015)...................................................................................... 35

*Roe v. Wade*, 410 U.S. 113 (1973).................................................................................... 14

*Rosemond v. United States*, 572 U.S. 65 (2014)................................................................ 25

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) .......... 33

*Schilling v. Rogers*, 363 U.S. 666 (1960).......................................................................... 23

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996) ......................................... 20, 21

*Shahi v. U.S. Dep't of State*, 572 F. Supp. 3d 470 (N.D. Ill. 2021)............................... 8, 9

*Sherbert v. Verner*, 374 U.S. 398 (1963)........................................................................... 28

*Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26 (1976).......................................... 3

*Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667 (1950)........................................... 23

*Skyline Wesleyan Church v. California Dep't of Managed Health Care,*
    968 F.3d 738 (9th Cir. 2020)...................................................................... 12

*Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83 (1998).............................. 6, 15

*Swan v. Board of Education of City of Chicago,*
    956 F. Supp. 2d 913 (N.D. Ill. 2013).........................................................4, 7, 15

*Tandon v. Newsom,* 593 U.S. 61 (2021)...................................................................... 30, 31

*Taylor v. McCament,* 875 F.3d 849 (7th Cir. 2017) ...................................................... 8, 9

*Thole v. U.S. Bank N.A.,* 590 U.S. 538 (2020) .................................................................. 6

*U.S. Citizens Ass'n v. Sebelius,* 705 F.3d 588 (6th Cir. 2013) ...................................... 35

*Uzuegbunam v. Preczewski,* 592 U.S. 279 (2021) ...................................................... 3, 15

*Verizon Maryland, Inc. v. Public Service Comm'n of Maryland,* 535 U.S. 635
    (2002) ............................................................................................................ 22

*Virginia Office for Protection and Advocacy v. Stewart,* 563 U.S. 247 (2011)................. 22

*Whole Woman's Health v. Jackson,* 595 U.S. 30 (2021) ................................................ 22

*Wisconsin v. Ho-Chunk Nation,* 512 F.3d 921 (7th Cir. 2008) ................................ 23, 24

**Statutes**

18 U.S.C. § 3626(a)(1)(B) ............................................................................................... 5

18 U.S.C. §§ 1461–1462 ............................................................................................... 25

215 ILCS 5/356z.4a .............................................................................................. passim

215 ILCS 5/356z.4a(a) .................................................................................................. 29

215 ILCS 5/356z.4a(b) .................................................................................................. 29

215 ILCS 5/356z.4a(d) .................................................................................................. 29

215 ILCS 5/356z.4a(e) .................................................................................................. 29

215 ILCS 5/356z.60 .............................................................................................. passim

215 ILCS 5/356z.60(b) .................................................................................................. 29

215 ILCS 5/356z.60(d) .................................................................................................. 29

215 ILCS 5/356z.60(f) ................................................................................................... 29

215 ILCS 5/356z.60(g) .................................................................................................. 29

215 ILCS 5/401.............................................................................................................. 4

8 U.S.C. § 1184(p)(2)(A).............................................................................................. 8, 9

23 U.S.C. § 158(a)(1)(A) ............................................................................................... 30

27 U.S.C. § 223 ........................................................................................................ 29, 31

28 U.S.C. § 1331 ........................................................................................ 24

28 U.S.C. § 1367 ........................................................................................ 23

28 U.S.C. § 1367(c) .................................................................................... 23

28 U.S.C. § 1461 ........................................................................................ 24

28 U.S.C. § 1462(c) .................................................................................... 24

28 U.S.C. § 2201 ................................................................................. 16, 24

42 U.S.C. § 18023(b)(2)(E)(i) ..................................................................... 4

42 U.S.C. § 18023(c)(1) ............................................................................. 28

42 U.S.C. § 18054(a)(6) ............................................................................. 30

42 U.S.C. § 1983 ................................................................................. passim

42 U.S.C. § 2000bb–1 ............................................................................... 19

42 U.S.C. § 238n(a) ............................................................................. 17, 27

42 U.S.C. § 238n(c)(2) .............................................................................. 27

Pub. L. No. 117-103, Div. H, § 507(d), 136 Stat. 49, 496 (2022) ...................... 17, 26

Pub. L. No. 117-103, Div. H, § 507(d)(2), 136 Stat. 49, 496 (2022) ......................... 26

Tex. Family Code § 2.001(b) ....................................................................... 5

**Constitutional Provisions**

U.S. Const. art. VI, cl. 2 ........................................................................ 4, 9

**Other Authorities**

Emily Badger, Trump Raises New Threat to Sanctuary Cities: Blocking Transportation Dollars, New York Times (Jan. 31, 2025) ............................. 31

David P. Currie, *Federal Jurisdiction in a Nutshell* (4th ed. 1999) ................... 23

John Harrison, *Ex Parte Young*, 60 Stan. L. Rev. 989 (2008) .......................... 22

Cass R. Sunstein, Section 1983 and the Private Enforcement of Federal Law, 49 U. Chi. L. Rev. 394 (1982) ............................................................ 19

A plaintiff needs only to allege and not prove his claims at the motion-to-dismiss stage, and all factual allegations are presumed true and construed in the light most favorable to the plaintiff. *See Christopher v. Harbury*, 536 U.S. 403, 406 (2002) ("Since we are reviewing a ruling on motion to dismiss, we accept Harbury's factual allegations and take them in the light most favorable to her."). The plaintiffs have assuredly *alleged* Article III standing and a claim on which relief may be granted under the rules of notice pleading. Whether the plaintiffs will ultimately prove their allegations remains to be seen, but there is no plausible basis for dismissing the lawsuit at this stage of the litigation.

## I. The Plaintiffs Have Alleged Article III Standing

The defendants do not contest the existence of injury in fact, but they mischaracterize the nature of the plaintiffs' injuries. The plaintiffs are not alleging that they are being "forced to purchase Department-regulated health insurance that covers abortion . . . pursuant to the RHA Provisions,"[1] and the complaint never asserts that the state is "forcing" the plaintiffs to purchase health insurance that covers elective abortions. Illinois has not enacted a law that requires its residents to carry health insurance, so the defendants cannot be "forcing" the plaintiffs to purchase any type of insurance, let alone insurance that covers elective abortions.[2]

The plaintiffs' injuries come from their inability to purchase state-regulated health insurance that excludes or limits abortion coverage. *See* Second Amended Complaint, ECF No. 19, at ¶¶ 34, 38, 42, 46, 50, 54, 64, 72, 80, 89, 98, 106, 115, 124, 133, 142, 150, 158, 166. That alone inflicts injury in fact, even if some of the plaintiffs can obtain non-state-regulated health insurance that excludes abortion coverage. *See Center for Auto Safety v. National Highway Traffic Safety Administration*, 793 F.2d 1322, 1332–34 (D.C. Cir. 1986)

---

1.   Def.'s Br., ECF No. 26, at 8.
2.   The members of Students for Life are required to purchase health insurance as a condition of enrollment in their universities. *See* Second Amended Complaint, ECF No. 19, at ¶¶ 32, 36, 40, 44, 48, 52. But even these individuals are not being "forced" to purchase health insurance that covers elective abortions, because no one is "forcing" them to attend university in Illinois.

(reduced opportunity to purchase a desired product inflicts injury in fact); *Orangeburg, South Carolina v. FERC*, 862 F.3d 1071, 1078 (D.C. Cir. 2017) ("The lost opportunity to purchase a desired product is a cognizable injury, even though Orangeburg *can* purchase, and *has* purchased, wholesale power from another source. . . . [E]ven though Orangeburg can and does purchase wholesale power from another source, the city cannot purchase wholesale power from the provider of its choice *nor* on its preferred terms"); Defs.' Br., ECF No. 26, at 4 (describing "health insurance products" that "are not regulated by the Department, and thus are not subject to the RHA Provisions."). Laws that reduce or restrict the availability of a desired product inflict Article III injury, even if those laws stop short of entirely removing the desired product from the market.

The state denies that these injuries are likely to be redressed by the requested relief. *See* Def.'s Br., ECF No. 26, at 10–14. The state also denies that these injuries are "fairly traceable" to the state's enforcement of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60. *See* Def.'s Br., ECF No. 26, at 15. Neither argument has merit.

### A. The Plaintiffs Have Alleged That Their Injuries Will Likely Be Redressed By The Requested Relief

The plaintiffs' requested relief would: (1) compel Acting Director Gillespie to issue rules requiring all state-regulated health insurers to offer plans that exclude coverage of elective abortions;[3] and (2) restrain the Acting Director from enforcing 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60.[4] The plaintiffs have alleged that each of these requested remedies, standing alone, is "likely" to redress, at least in part, their injuries.

---

3.  Second Amended Complaint, ECF No. 19, at ¶ 204(f).
4.  Second Amended Complaint, ECF No. 19, at ¶ 204(e).

1. **The Plaintiffs Have Alleged That Their Injuries Will Likely Be Redressed, At Least In Part, By An Injunction That Compels The Acting Director To Require State-Regulated Health Insurers To Offer Plans That Exclude Coverage Of Elective Abortions**

When conducting redressability analysis, a court must assume that the plaintiffs will prevail on the merits and obtain their requested relief. *See Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976) ("[T]he relevant inquiry is whether . . . the plaintiff has shown an injury to himself that is likely to be redressed *by a favorable decision*." (emphasis added)); *Federal Election Commission v. Ted Cruz for Senate*, 596 U.S. 289, 298 (2022) ("For standing purposes, we accept as valid the merits of appellees' legal claims"). And a plaintiff will demonstrate redressability even if the requested remedy will only partially redress his Article III injuries; he is not required to allege or prove that his sought-after relief will eliminate or fully redress the harms that he is suffering. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) ("[T]he ability 'to effectuate a partial remedy' satisfies the redressability requirement." (quoting *Church of Scientology of California v. United States*, 506 U.S. 9, 13 (1992)).

The plaintiffs are requesting a permanent injunction that would:

> compel[] Acting Director Gillespie and her successors to issue and enforce rules pursuant to their statutory rulemaking authority that prohibit state-regulated health-insurance plans from including any policy provision that covers elective abortions unless that health insurer: (1) Provides a notice to enrollees, as part of the summary of benefits and coverage explanation, at the time of enrollment, that the plan covers elective abortions; (2) Offers a separate state-regulated health plan that excludes any coverage of elective abortion; and (3) Ensures that none of the premiums collected from beneficiaries enrolled in a plan that excludes coverage of elective abortion are used to directly or indirectly subsidize elective abortions or provide coverage of elective abortions in any way[.]

Second Amended Complaint, ECF No. 19, at ¶ 204(f); Def.'s Br., ECF No. 26, at 10 (acknowledging that the plaintiffs are requesting relief that would "order[] the Department to force non-party insurance companies to offer the specific insurance plan they desire."). This relief, if awarded, would indisputably redress the plaintiffs' injuries by ensuring that state-regulated health insurers offer plans that exclude coverage for elective abortions.

The defendants claim that the Department of Insurance lacks authority under state law to compel insurers to offer plans that exclude abortion coverage. *See* Def.'s Br., ECF No. 26, at 11–12. Even if this assertion were true (and we will assume for the sake of argument that it is),[5] it has no bearing on the redressability inquiry. A federal court's remedial powers are not limited or in any way constrained by state law. *See Haney v. County Board of Education of Sevier County*, 429 F.2d 364, 368 (8th Cir. 1970). And when a federal court remedies a constitutional or federal statutory violation by entering an injunction directed at state officials, that federal-court injunction trumps any limitations that state law might impose on the official's authority. *See, e.g.*, *Madej v. Briley*, 371 F.3d 898, 899 (7th Cir. 2004) ("[T]he Constitution supersedes any incompatible state principles."). So the state's claim that Acting Director Gillespie "does not have the authority to carry out"[6] the requested injunction is

---

5.  The state acknowledges, as it must, that the Department "has some statutorily-authorized rulemaking authority." Def.'s Br., ECF No. 26, at 12; *see also* 215 ILCS 5/401 ("The Director is charged with the rights, powers and duties appertaining to the enforcement and execution of all the insurance laws of this State. He shall have the power (a) to make reasonable rules and regulations as may be necessary for making effective such laws"). The grant of rulemaking authority in section 401 is capacious, as it encompasses "reasonable rules and regulations as may be necessary for making" the state's insurance laws "effective," which includes rules needed to ensure that the plaintiffs' First Amendment rights are protected and that federal statutes are obeyed. *Id.*; *see also* U.S. Const. art. VI, cl. 2 (requiring state law to give way to "supreme" federal statutes and constitutional provisions). The state does not explain why the Director would lack statutory authority under 215 ILCS 5/401 to issue the rules proposed by the plaintiffs.

6.  Def.'s Br., ECF No. 26, at 11 (quoting *Swan v. Board of Education of City of Chicago*, 956 F. Supp. 2d 913, 918 (N.D. Ill. 2013) (internal quotation marks omitted)); *see also id.* (falsely describing the plaintiffs' requested relief as "a legal impossibility"). The state also ignores the Acting Director's statutory responsibilities under federal law, which requires the Acting Director to enforce the segregation-of-funds requirement for plans offered on the state exchange. *See* 42 U.S.C. § 18023(b)(2)(E)(i) ("State health insurance commissioners shall ensure that health plans comply with the segregation requirements in this subsection through the segregation of plan funds in accordance with applicable provisions of generally accepted accounting requirements"). The not only authorizes but *compels* the Acting Director to enforce the segregation-of-funds remedy requested by the plaintiffs, at least with respect to policies offered on the Illinois exchange.

---

false; a state official *always* has authority to carry out duties imposed by a federal court's injunction, which must be followed over any contrary state law.

Consider the same-sex marriage litigation that culminated in *Obergefell v. Hodges*, 576 U.S. 644 (2015). The plaintiffs in those cases sought injunctions that would compel county clerks to issue marriage licenses to same-sex couples—even though the county clerks "lack[ed] the authority"[7] under state law to issue those licenses. Indeed, existing state law at the time not only refused to authorize clerks to issue marriage licenses to same-sex couples but explicitly prohibited them from doing so. *See, e.g.*, Tex. Family Code § 2.001(b) ("A license may not be issued for the marriage of persons of the same sex."). But none of that affected redressability or Article III standing. The plaintiffs' injuries were redressable because their *requested* relief would compel county clerks to issue marriage licenses to same-sex couples—and it did not matter that state law refused to authorize (indeed, explicitly prohibited) the clerks from engaging in the conduct that the sought-after injunction would compel. And once the federal courts began issuing injunctions that required the issuance of same-sex marriage licenses, the clerks were not only empowered but obligated to issue those licenses, despite the continued absence of state-law authority. Plaintiffs often seek and obtain injunctions that compel state officials to engage in conduct that state law prohibits or refuses to authorize. *See Brown v. Plata*, 563 U.S. 493 (2011) (ordering California officials to reduce the state's prison population); *Brown v. Board of Education*, 349 U.S. 294 (1954) (ordering state and local officials to desegregate public schools despite the continued existence of state laws requiring school segregation); 18 U.S.C. § 3626(a)(1)(B) (allowing federal courts in prison litigation to award relief "that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law" when certain conditions are met). None of that presents any obstacle to redressability or Article III standing. And a court that orders state officials to act beyond the scope of their statutorily granted

---

7.    Def.'s Br., ECF No. 26, at 11.

powers does not "step into the place of the legislature" or usurp the "job of the General Assembly." Def.'s Br., ECF No. 26, at 12. Courts must issue remedies in response to constitutional or federal statutory violations that ensure that a litigant's federal rights are fully protected. A court does not "legislate" when it compels action from state officials that is necessary to secure a litigant's constitutional or federally protected rights—even if the required action is unauthorized or explicitly prohibited by state law.

More importantly, even if state law were somehow capable of limiting the scope of permissible remedies that a federal court could issue, that would have no bearing on Article III standing. Redressability analysis assumes that the court will award the requested relief, and it asks whether that *requested* relief is "likely to redress" the plaintiffs' Article III injuries. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103 (1998) ("[T]here must be redressability—a likelihood that the *requested* relief will redress the alleged injury." (emphasis added)); *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020) ("To establish standing under Article III of the Constitution, a plaintiff must demonstrate . . . (3) that the injury would likely be redressed by the *requested* judicial relief." (emphasis added)). Whether the law permits the plaintiffs to obtain their requested relief is a merits inquiry, and it is not to be considered in the standing analysis. *See Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 501–02 (7th Cir. 2005) ("The relief requested by LDF includes '[a]n order declaring Paragraph 16 void . . . thereby severing it from the Ho-Chunk compact.' Ho-Chunk argues that this relief is not a remedy that the IGRA affords and, because it cannot be granted, will not redress the alleged injury. . . . This argument confuses standing with the merits. . . . Redressability . . . depends upon the relief requested, not the relief LDF could prove it was entitled to on the merits.").

None of the cases cited in the state's brief hold that the injunctive relief described in paragraph 204(f) is incapable of redressing the plaintiffs' injuries. In *Swan v. Board of Education of City of Chicago*, 956 F. Supp. 2d 913 (N.D. Ill. 2013),[8] the plaintiffs sued the city of Chicago, the Board of Education of the city of Chicago, and the chief executive officer of the Chicago Public Schools, seeking an injunction that would restrain the defendants from closing a slate of public schools. *See id*. at 916. The district court dismissed the city (and *only* the city) for lack of Article III standing because the Board and not the city wielded authority over school closures. *See id*. at 917 ("[A]s a matter of law, the Board, not the City, is responsible for school closings"); *id*. at 919 ("[T]he lawful authority to make decisions affecting the closings of the schools or the impact on children in special education is a statutory authority that formally and exclusively belongs to the Board." (citation and internal quotation marks omitted)). So a remedy that enjoins the *city* from closing the schools—even it were obeyed—would do nothing to redress the plaintiffs' injuries because it would leave the Board free to close the schools. *Swan* has no application here, where the plaintiffs' requested injunction would assuredly redress the plaintiffs' injuries if it were implemented and obeyed, and where the state's objections to the requested injunction turn solely on the idea that it would compel the Acting Director to act beyond the scope of her state-law authorities.[9]

---

8. *McDaniel v. Board of Education of City of Chicago*, 956 F. Supp. 2d 887 (N.D. Ill. 2013), which the state cites on page 12 of its brief, is a companion case to *Swan* and the opinions are nearly identical. Everything said about *Swan* is equally applicable to *McDaniel*.

9. Although *Swan* is correctly decided, there is some unfortunate language in the opinion implying that federal courts are forbidden to order state officials to act in a manner contrary to state law. *See Swan*, 956 F. Supp. 2d at 919 ("Plaintiffs ask this Court to order the City to act in a manner that Illinois law prohibits; this the Court will not do."). There is also language suggesting that federal courts are incapable of ordering state officials to act in a manner that exceeds their state-law authorities. *See id*. at 918 ("[T]he Court cannot enjoin a defendant 'to act in any way that is beyond [the defendant's] authority in the first place.'" (citation omitted)); *id*. ("[A] plaintiff . . . must demonstrate that the defendant to be enjoined has the authority to effectuate the injunction."). Those statements are obviously untrue; federal courts can and do order state officials to act in ways that contravene state law. *See* pp. 5–6, *supra*. And a federal-

*Pavlock v. Holcomb*, 35 F.4th 581 (7th Cir. 2022), likewise found an absence of redress-ability in situations where the plaintiffs' *requested* relief—even if it were to be awarded and implemented—was incapable of redressing the alleged Article III injuries. *See id.* at 588 ("Even if we were to agree with the Owners, therefore, a judgment in their favor would be toothless."); *id.* at 589 ("[T]he Owners want an injunction barring the State from enforcing *Gunderson* or HEA 1385. Assuming . . . that we can entertain such a request, it remains true that such an injunction would not redress the Owners' injury. . . . An injunction barring the State from enforcing the decision would do nothing to alter the state's title to the land. . . . The requested injunction would not give him title to submerged lands that Indiana law . . . says belongs to the state."); *id.* at 590 ("[O]rdering any of the named state defendants not to enforce a state property law cannot redress the Owners' injuries, because non-enforcement will not change the content of the underlying law itself.").

Finally, *Taylor v. McCament*, 875 F.3d 849 (7th Cir. 2017), and *Shahi v. U.S. Dep't of State*, 572 F. Supp. 3d 470 (N.D. Ill. 2021), hold that a plaintiff fails to establish redressa-bility when his requested remedy is precluded by a *federal* statute that the plaintiff is not challenging as unconstitutional. The plaintiff in *Taylor* sought an injunction that would com-pel the United States Citizenship and Immigration Services to immediately issue 80,000 nonimmigrant U-visas to individuals on a waiting list. *See Taylor*, 875 F.3d at 851. But a federal statute, which the plaintiff did not challenge as unconstitutional, prohibited the agency from issuing more than 10,000 U-visas per year. *See* 8 U.S.C. § 1184(p)(2)(A). The court held that the requested injunction, even if it were to be granted, could not redress the

---

court injunction by definition provides the enjoined litigant with the "authority" needed to carry out the court's instructions. *See id.* What *Swan* holds is that an injunc-tion that *restrains* a state official from taking actions that he has no state-law authority to undertake cannot "redress" a plaintiff's Article III injuries because a remedy of that sort does nothing to change the status quo and cannot alleviate the plaintiff's harms.

plaintiff's injury because the agency would remain obligated to obey the federal statutory cap on U-visas as the supreme law of the land:

> The statute clearly provides that "[t]he number of aliens who may be issued visas or otherwise provided [U-visas] . . . in any fiscal year *shall* not exceed 10,000." 8 U.S.C. § 1184(p)(2)(A) (emphasis added). . . . Thus, even if a court ordered USCIS to immediately issue 80,000 U-visas, the agency would lack the statutory authority to do so.

*Taylor*, 875 F.3d at 851. *Shahi* rested on a similar rationale, holding that the plaintiffs failed to establish redressability because a federal statutory deadline, which the plaintiffs were not challenging as unconstitutional, precluded the Department of State from complying with the injunction that the plaintiffs sought. *See Shahi*, 572 F. Supp. 3d at 480 ("The Court cannot order the Department of State to adjudicate their visa applications now, more than a year after the relevant statutory deadline has expired, because the Department is powerless to do so.").

*Taylor* and *Shahi* denied standing because a federal court's remedial powers are constrained by *federal* statutes, which must be obeyed as the "supreme Law of the Land"[10] except in cases of conflict between the federal statute and the Constitution.[11] *Taylor* and *Shahi* do not hold or imply that *state* law can limit control a court's authority to remedy violations of the Constitution or federal statutes—and it would be absurd to claim that federal courts are powerless to compel state officials to take actions that are unauthorized (or explicitly prohibited) by state law. *See* pp. 5–6, *supra*.

---

10. U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

11. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803).

2.    **The Plaintiffs Have Alleged That Their Injuries Are Likely To Be Redressed, At Least In Part, By An Injunction That Restrains The Acting Director From Enforcing 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60**

The plaintiffs are also requesting an injunction that would restrain the Acting Director from enforcing 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60. *See* Second Amended Complaint, ECF No. 19, at ¶ 204(e). The state claims that this requested relief will not "redress" the plaintiffs' injuries because (according to the state) the plaintiffs "have not pled that their requested relief has a substantial likelihood of redressing their alleged injury." Def.'s Br., ECF No. 26, at 13. But the plaintiffs have pleaded exactly that, and this factual allegation *must* be assumed true on a motion to dismiss. *See Christopher*, 536 U.S. at 406 ("Since we are reviewing a ruling on motion to dismiss, we accept Harbury's factual allegations and take them in the light most favorable to her."). Paragraph 58 of the second amended complaint states:

> If the enforcement of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60 is declared unconstitutional and enjoined, ***then at least some private insurers in Illinois will respond by offering state-regulated health-insurance plans that exclude or limit coverage for elective abortion.*** Other private insurers in Illinois will respond by offering state-regulated plans that (at the very least) impose co-pays or other cost-sharing arrangements that require beneficiaries who obtain elective abortions to pay at least some of the costs rather than imposing all of those costs on other beneficiaries. State-regulated health insurers in Illinois offered plans of this sort before the state's enactment and enforcement of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60. *See* paragraph 0, *supra*. That will redress the injury to Individuals A through F, at least in part, by reducing the extent to which Individuals A through F must subsidize other people's abortions as a condition of purchasing state-regulated health insurance. *See Uzuegbunam*, 592 U.S. at 291 ("[T]he ability 'to effectuate a partial remedy' satisfies the redressability requirement." (quoting *Church of Scientology*, 506 U.S. at 13)).

Second Amended Complaint, ECF No. 19, at ¶ 58 (emphasis added); *see also id.* at ¶¶ 68, 76, 84, 93, 102, 111, 120, 129, 138, 146, 154, 162, 171 (similar allegations with respect to each of the other plaintiffs). And paragraph 26 of the second amended complaint states:

> Before the enactment of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60, there were some private insurers in Illinois that offered state-regulated health-

> insurance plans that excluded or limited coverage for elective abortions. There
> were also private insurers in Illinois that offered state-regulated health-insur-
> ance plans that imposed co-pays or other cost-sharing arrangements that re-
> quired beneficiaries who obtain elective abortions to pay at least some of the
> costs themselves, rather than imposing all of those costs on other beneficiaries.

Second Amended Complaint, ECF No. 19, at ¶ 26. The state cannot (and does not) deny
the truth of these allegations. Yet it claims that the plaintiffs have *failed* to allege redressability
because "they do not plead any facts to support their theory." Def.'s Br., ECF No. 26, at 13.
That is an outright falsehood. Every single sentence in paragraphs 26 and 58 (and the para-
graphs that mirror the allegations of paragraph 58) is a statement of fact, and every one of
those factual assertions must be assumed true at this stage of the proceedings. *See, e.g.*, Sec-
ond Amended Complaint, ECF No. 19, at ¶ 58 ("If the enforcement of 215 ILCS
5/356z.4a and 215 ILCS 5/356z.60 is declared unconstitutional and enjoined, then at least
some private insurers in Illinois will respond by offering state-regulated health-insurance
plans that exclude or limit coverage for elective abortion.").[12] The state also complains that
the factual claims in paragraph 58 are "speculative," but there is nothing "speculative" about
the claim that at least *some* private insurers in Illinois will offer state-regulated health-insur-
ance policies that exclude or limit coverage of elective abortions (or that at least impose co-
pays or other cost-sharing arrangements on this coverage) if the enforcement of 215 ILCS
5/356z.4a and 215 ILCS 5/356z.60 is enjoined—especially when state-regulated insurers
offered policies of this sort before the enactment of 215 ILCS 5/356z.4a and 215 ILCS
5/356z.60. *See, e.g.*, Second Amended Complaint, ECF No. 19, at ¶ 26 ("Before the enact-
ment of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60, there were some private insurers
in Illinois that offered state-regulated health-insurance plans that excluded or limited cover-
age for elective abortions."). Indeed, if every single state-regulated health-insurance policy
would cover elective abortions without cost-sharing in the absence of 215 ILCS 5/356z.4a

---

12.  We cannot comprehend how the state can deny that this statement is a "fact," or insist
     that the plaintiffs "do not plead any facts to support their theory." Def.'s Br., ECF No.
     26, at 13.

and 215 ILCS 5/356z.60, then there would have been no need for Illinois to have enacted these statutes in the first place. Illinois enacted 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60 because market forces alone are insufficient to compel every private insurer to cover elective abortions without cost-sharing, and because insurers are willing to offer at least some policies that limit or exclude coverage of elective abortion in the absence of state coercion. It is surely "plausible"[13] to allege that an insurer will respond to the requested injunction by offering at least one state-regulated policy that restricts or limits abortion coverage, or that imposes co-pays or other cost-sharing arrangements on beneficiaries who obtain abortions.

The Ninth Circuit addressed a similar situation in *Skyline Wesleyan Church v. California Dep't of Managed Health Care*, 968 F.3d 738 (9th Cir. 2020). The plaintiffs in *Skyline*, like the plaintiffs here, were challenging the constitutionality of a compulsory abortion-coverage law. And the Court held that the plaintiffs had established redressability from the fact that insurers had offered policies that excluded or limited abortion coverage before the state's issuance of the abortion-coverage edict:

> [T]hat insurers had previously offered plans that were acceptable to Skyline is strong evidence that, if a court were to order that the Coverage Requirement could not be applied to prevent approval of a health plan for Skyline that comports with Skyline's religious beliefs, at least one of the many insurers who do business in California would agree to offer the type of plan Skyline seeks. We acknowledge that it is possible no insurer would do this. But we need not be *certain* how insurers would respond. Instead, our inquiry is focused on whether the predictable effect of an order granting the relief Skyline seeks is that at least one insurer would be willing to sell it a plan that accords with its religious beliefs. We conclude that is the predictable effect.

*Id.* at 750 (citations omitted); *see also Cedar Park Assembly of God of Kirkland, Washington v. Kreidler*, 860 Fed. Appx 542, 543 (9th Cir. 2021) ("[T]hat Cedar Park had access to an

---

13.   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[abortion-free] plan is strong evidence that Cedar Park could obtain a similar plan from Kaiser Permanente or another health insurer if the state is enjoined from enforcing [its compulsory abortion-coverage law].").[14] *Skyline*'s analysis applies here, and the state does not deny the plausibility of the plaintiffs' claim that the requested injunction will cause at least one state-regulated health-insurance policy to remove or scale back its abortion coverage.[15]

---

14. The state cites the Ninth Circuit's subsequent ruling in *Cedar Park Assembly of God of Kirkland Washington v. Kreidler*, 130 F.4th 757 (9th Cir. 2025), but that case is inapposite because it was decided on summary judgment, where plaintiffs must produce evidence rather than mere allegations of redressability. *See id.* at 763. Indeed, the Ninth Circuit panel in *Cedar Park* acknowledged that the plaintiff had adequately alleged the elements of standing at the motion-to-dismiss stage. *See id.* at 764 ("Plaintiff adequately pleaded standing at the motion-to-dismiss stage by alleging that, due to the Parity Act, '[Kaiser] stopped offering a plan with abortion coverage restrictions and [Plaintiff] could not procure comparable replacement coverage.'" (citation omitted)). *Cedar Park* is doubly inapposite because the redressability problem in that case arose from the fact that state law already permitted the plaintiff to obtain a state-regulated plan that excluded abortion coverage, which is not the situation here. *See id.* at 766 ("Washington insurers are free to offer, or not to offer, no-abortion health plans. Because their decision-making in that regard is independent of the Parity Act, a declaration that the statute is unconstitutional would not redress Plaintiff's alleged inability to obtain acceptable coverage.").

15. The state observes that the plaintiffs must allege a "substantial likelihood" that their requested injunction will redress their injuries. *See* Def.'s Br., ECF No. 26, at 14 (quoting *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Services*, 489 F.3d 1267, 1275 (D.C. Cir. 2007)). But the plaintiffs have gone beyond that by alleging that it is *certain* that at least one state-regulated health-insurance policy will limit or reduce its abortion coverage if the state is enjoined from enforcing 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60. *See* Second Amended Complaint, ECF No. 19, at ¶ 58 ("[A]t least some private insurers in Illinois *will* respond by offering state-regulated health-insurance plans that exclude or limit coverage for elective abortion" (emphasis added)); *see also id.* at ¶¶ 68, 76, 84, 93, 102, 111, 120, 129, 138, 146, 154, 162, 171 (same). That allegation must be assumed true on a motion to dismiss. *See Christopher*, 536 U.S. at 406 ("Since we are reviewing a ruling on motion to dismiss, we accept Harbury's factual allegations and take them in the light most favorable to her.").

**B.     The Plaintiffs Have Alleged That Their Injuries Are Fairly Traceable To The Acting Director's Enforcement Of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60**

The state denies that the plaintiffs' injuries are "fairly traceable" to the enforcement of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60, but the complaint specifically alleges that insurers offered state-regulated policies that excluded or limited abortion coverage prior to the enactment of these statutes. *See* Second Amended Complaint, ECF No. 19, at ¶ 26. It also alleges that the state's enforcement of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60 has made those policies unavailable to the plaintiff. *See id.* at ¶ 27. The state does not contest the truth of these allegations—and it cannot contest their truth on a motion to dismiss.

Yet the state claims that the plaintiffs have failed to allege traceability because the Acting Director enforces 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60 against insurance companies rather than would-be purchasers of health insurance. *See* Def.'s Br., ECF No. 26, at 15. But this situation is no different from an abortion ban that imposes penalties on abortion providers while exempting pregnant women from punishment, and a pregnant woman who cannot obtain an abortion on account of these laws has standing to sue regardless of whether the state enforces its abortion ban against patients or providers. *See Roe v. Wade*, 410 U.S. 113, 124–25 (1973), *overruled on other grounds Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022). Standing is equally met in this case because an injury caused by a third party's compliance with the law is *always* traceable to the government official who enforces the disputed statutes, as compliance is "the predictable effect" of the state's enforcement. *See Department of Commerce v. New York*, 588 U.S. 752, 768 (2019) (holding that the traceability element of Article III standing is satisfied when the plaintiffs' "theory of standing . . . does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties.").

The state suggests that its enforcement of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60 merely "encouraged" insurance companies to eliminate state-regulated health-insurance policies that exclude or limit abortion coverage. *See* Def.'s Br., ECF No. 26, at 15

("Plaintiffs cannot establish standing merely by alleging that a challenged policy 'encouraged' non-parties to deny services that caused injury"). That is untenable. The state's enforcement of these laws *compelled* insurers to cover every abortion without cost-sharing arrangements in every state-regulated health-insurance plan, and there is nothing "speculative"[16] about whether this outcome is fairly traceable to the state's enforcement of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60.

### C. The Plaintiffs Have Standing To Sue For Nominal And Compensatory Damages

The plaintiffs are suing for nominal and compensatory damages in addition to prospective relief. *See* Second Amended Complaint, ECF No. 19, at ¶ 204(g). An award of nominal damages satisfies Article III's redressability requirement by definition. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 283 (2021) ("[A]n award of nominal damages can by itself redress a past injury."). The state has not argued that the plaintiffs lack standing to seek damages, so the Court should preserve the claims for damages even if it agrees with the state's redressability objections to the sought-after prospective relief.

## II. The Plaintiffs Have A Private Right Of Action Enforce Their Statutory Preemption Claims[17]

The state contends that the plaintiffs lack a private right of action to enforce their statutory preemption claims against the plaintiffs. *See* Def.'s Br., ECF No. 26, at 16–21. Although

---

16. Def.'s Br., ECF No. 26, at 15 (internal quotation marks omitted); *see also id.* ("[I]t is 'purely speculative whether' non-parties' actions were fairly traced to defendants." (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42–43 (1976)).

17. The plaintiffs respectfully ask the Court to conditionally rule on the defendants' Rule 12(b)(6) motion even if it decides to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction. *See Swan v. Board of Education of City of Chicago*, 956 F. Supp. 2d 913, 917 (N.D. Ill. 2013) (proceeding to rule, in the alternative, that plaintiffs' claims should be dismissed under Rule 12(b)(6) after holding that those claims must also be dismissed for lack of subject-matter jurisdiction under Rule 12(b)(1)). Although *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), abolished the practice of "hypothetical jurisdiction" and prohibits courts from ruling on merits-related issues before jurisdiction is secure, there is nothing wrong with an opinion stating how this

the state correctly observes that the relevant statutes do not create private rights of action of their own accord,[18] many if not all of these statutes may nonetheless be enforced by private litigants under 42 U.S.C. § 1983, the Declaratory Judgment Act (28 U.S.C. § 2201), and the implied cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908), and *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 326–27 (2015).

### A. The Plaintiffs May Sue Under 42 U.S.C. § 1983 To Enforce The Coates–Snowe Amendment, The Weldon Amendment, And The Religious Freedom Restoration Act

We agree with the state that the Comstock Act does not create federal "rights" enforceable under 42 U.S.C. § 1983. *See* Def.'s Br., ECF No. 26, at 18 n.15. But the Coates–Snowe Amendment, the Weldon Amendment, and the Religious Freedom Restoration Act all confer federally protected "rights" under *Gonzaga University v. Doe*, 536 U.S. 273 (2002), and *Health and Hospital Corporation of Marion County v. Talevski*, 599 U.S. 166 (2023). A statute is enforceable under 42 U.S.C. § 1983 if it establishes a right in "clear and unambiguous terms." *Gonzaga*, 536 U.S. at 290; *see also Talevski*, 599 U.S. at 180 ("Statutory provisions must unambiguously confer individual federal rights." (emphasis removed)). And this test is satisfied when a federal statutory provision is: (1) "phrased in terms of the persons benefitted"; and (2) contains "rights-creating," individual-centric language with an "unmistakable focus on the benefited class." *Id*. at 183 (citations and internal quotation marks omitted); *see also id*. at 183–84 ("Conversely, we have rejected § 1983 enforceability where the statutory provision 'contain[ed] no rights-creating language'; had 'an aggregate, not individual, focus'; and 'serve[d] primarily to direct the [Federal Government's] distribution of public funds.'" (citations omitted)).

---

Court *would* have ruled on the Rule 12(b)(6) motion if its jurisdictional determination had gone the other way. This is a sound judicial practice that comports with *Steel Co.*, as it avoids the need for multiple sequential appeals and can allow both the jurisdictional and merits issues to be teed up for review in a single appeal.

18. *See* Def.'s Br., ECF No. 26, at 16.

The Coates–Snowe Amendment and the Weldon Amendment comfortably satisfy this test. Each of the statutes is phrased in terms of the persons benefitted, and each of them establishes nondiscrmination rights with individual-centric language that unmistakably focuses on the benefited class—namely, the individuals and entities that refuse to participate in abortions. Consider the text of the Coates–Snowe amendment:

> The Federal Government, and any State or local government that receives Federal financial assistance, ***may not subject any health care entity to discrimination*** on the basis that—
>
> (1) ***the entity refuses*** to undergo training in the performance of induced abortions, to require or provide such training, to perform such abortions, or to provide referrals for such training or such abortions; [or]
>
> (2) ***the entity refuses*** to make arrangements for any of the activities specified in paragraph (1);

42 U.S.C. § 238n(a) (emphasis added). This secures a federal "right" for individual healthcare entities that refuse to participate in abortions—a right to be free from discrimination at the hands of state or local governments that receive federal financial assistance. The statute lists the protected conduct of the "entity" in subsections (1) and (2), is phrased in terms of the "entity" that the statute benefits, and has an "unmistakable focus" on the "entity" and its particular conscientious objections that trigger the non-discrimination right.

The Weldon Amendment also contains rights-creating language:

> None of the funds made available in this Act may be made available to a Federal agency or program, or to a State or local government, if such agency, program, or government ***subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions.***

Pub. L. No. 117-103, Div. H, § 507(d), 136 Stat. 49, 496 (2022) (emphasis added). Like the Coates–Snowe amendment, the Weldon Amendment secures a non-discrimination "right" for individuals and institutions that refuse to participate in abortions. It is phrased in terms of the "institutional or individual health care entit[ies]" benefitted by the law, and it

establishes an anti-discrimination right with an "unmistakable focus on" those institutions and individuals. And although the Weldon Amendment and the Coates–Snowe Amendment also refer to the governmental entities and recipients of federal funds that must respect these statutorily conferred non-discrimination rights, that does nothing to defeat the existence of rights-creating language in either of the statutes. *See Talevski*, 599 U.S. at 185 ("[I]t would be strange to hold that a statutory provision fails to secure rights simply because it considers, alongside the rights bearers, the actors that might threaten those rights (and we have never so held).").

The state denies that either of these statutes confers "rights,"[19] but it does not explain how an anti-discrimination statute fails to confer "rights" on those that it protects from discrimination. Indeed, we are unaware of any federal anti-discrimination statute that has been held *not* to contain rights-creating language, even though some federal anti-discrimination statutes are nonenforceable under 42 U.S.C. § 1983 under the *Sea Clammers* principle. *See Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981). Instead, the state offers only a bald assertion that the Coates–Snowe Amendment and the Weldon Amendment "operate 'primarily to direct the Federal Government's distribution of public funds.'" Def.'s Br., ECF No. 26, at 19 (quoting *Talevski*, 599 U.S. at 183–84). But *Talevski* rejects the idea that statutes that impose conditions on the receipt of federal funds are incapable of creating "rights" enforceable under 42 U.S.C. § 1983. *See Talevski*, 599 U.S. at 177 ("We are not persuaded by HHC's argument . . . that Talevski cannot invoke § 1983 to vindicate the rights the FNHRA provisions at issue here purport to recognize because Congress seems to have enacted the FNHRA pursuant to the spending power recognized in Article I, § 8, of the Constitution."). And *Talevski* says that a statutory provision fails to confer "rights" under 42 U.S.C. § 1983 when it: (1) "contain[s] no rights-creating language"; (2) has "an aggregate, not individual, focus"; *and* (3) "serve[s] primarily

---

19.    *See* Def.'s Br., ECF No. 26, at 19.

to direct the [Federal Government's] distribution of public funds." *Talevski*, 599 U.S. at 183–84 (internal quotation marks omitted). *All three* conditions must be met to fall within this *Talevski* caveat, and the state does not deny that the Coates–Snowe amendment and the Weldon Amendment contain "rights-creating language" and have an individual rather than an aggregate focus.

The Religious Freedom Restoration Act presents an even easier case under 42 U.S.C. § 1983, as RFRA indisputably contains rights-creating language under *Gonzaga* and the state does not dispute this point. *See* 42 U.S.C. § 2000bb–1. The state denies that Innovator can enforce RFRA under 42 U.S.C. § 1983 because it claims that RFRA itself "does not permit suit against states." That is a non sequitur. Whether RFRA creates a private right of action against states (or state officials) has no bearing on whether RFRA establishes federally pro-tected "rights" enforceable against state officials under 42 U.S.C. § 1983. Section 1983 ob-viously allows lawsuits against state officials, and it allows litigants to vindicate their federal statutory rights regardless of whether the rights-creating statute would authorize that lawsuit of its own accord. *See Maine v. Thiboutot*, 448 U.S. 1 (1980); Cass R. Sunstein, *Section 1983 and the Private Enforcement of Federal Law*, 49 U. Chi. L. Rev. 394 (1982).

Nor is this claim precluded by *City of Boerne v. Flores*, 521 U.S. 507 (1997), because the statutory "right" that Innovator is asserting under 42 U.S.C. § 1983 is its right to be free from *federal* impositions on its exercise of religion. *See* 42 U.S.C. § 2000bb–1 (prohibiting only the federal government from substantially burdening a person's exercise of religion with-out sufficient justification). Innovator's claim is not seeking to incorporate RFRA's protec-tions against state officials; it is suing the Acting Director only because she is causing Inno-vator to be subjected to RFRA violations at the hands of the *federal* government. The claim is no different from a 42 U.S.C. § 1983 lawsuit brought against private entities (such as public-sector unions) that cause or contribute to a government's violations of constitutional rights. *See Janus v. American Federation of State, County, and Municipal Employees, Council 31*, 585 U.S. 878 (2018); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982)

("To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents." (citation and internal quotation marks omitted)). A section 1983 claim of this sort does not extend the Bill of Rights to private parties or abolish the state-action doctrine; it simply recognizes that individuals outside the state or federal government can cause or contribute to a government's deprivation of constitutional or statutory rights. So too here. The Acting Director's enforcement of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60 is causing the *federal* government to violate Innovator's rights under RFRA through its enforcement of the ACA's employer-coverage mandate. That means that Acting Director is "cau[sing]" Innovator to be "subjected" to the "deprivation" of its statutory RFRA rights, and that makes her a proper defendant in this 42 U.S.C. § 1983 action. *See* 42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable . . .").

**B.     The Plaintiffs May Sue Under *Ex Parte Young* To Enforce The Comstock Act, The Coates–Snowe Amendment, The Weldon Amendment, And The Religious Freedom Restoration Act**

*Osborn* v. *Bank of United States,* 22 U.S. (9 Wheat.) 738 (1824), and *Ex parte Young*, 209 U.S. 123 (1908), recognize and establish an implied cause of action that allows litigants to seek injunctive relief against state officials who act in violation of federal law. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015) (acknowledging "[t]he power of federal courts of equity to enjoin unlawful executive action"). The plaintiffs may pursue their statutory preemption claims under this implied cause of action.

The Supreme Court has recognized that Congress may preclude resort to this equitable remedy by establishing an exclusive remedial scheme for the alleged statutory violations. *See id.* at 327 ("The power of federal courts of equity to enjoin unlawful executive action is

subject to express and implied statutory limitations."); *Seminole Tribe of Florida* v. *Florida*, 517 U.S. 44, 73–74 (1996) (holding that Congress may implicitly preclude resort to *Ex parte Young* by establishing a "carefully crafted and intricate remedial scheme."); *id.* at 74 (only when Congress has established a "detailed" remedial scheme should courts "hesitate before . . . permitting an action against a state officer based upon *Ex parte Young*.").

But none of the statutes at issue contain a "detailed" or "carefully crafted and intricate" remedial scheme that precludes reliance on *Ex parte Young*. These situations arise when Congress has established a reticulated remedial regime that seeks to impose only modest or carefully calibrated consequences for statutory violations, and in which a lawsuit brought under *Ex parte Young* would subvert a congressional desire to use "kid gloves" rather than an "iron fist." *American Insurance Ass'n v. Garamendi*, 539 U.S. 396, 427 (2003); *Seminole Tribe*, 517 U.S. at 74 (describing how Congress established "intricate" remedial procedures that evinced an intent "not only to define, but also to limit significantly, the [statutory] duty imposed."). Preclusion of *Ex parte Young* remedies may also arise when Congress has established a withholding-of-funds remedy in a statute that also contains a "judicially unadministrable" text. *See Armstrong*, 575 U.S. at 328–329 ("The provision for the Secretary's enforcement by withholding funds might not, by itself, preclude the availability of equitable relief. But it does so *when combined with* the judicially unadministrable nature of § 30(A)'s text." (emphasis added and removed) (citations omitted)). Neither of these situations applies here. None of the relevant federal statutes contain "carefully crafted and intricate"[20] remedial schemes, and it is untenable to think that Congress would want to leave private litigants without redress under *Ex parte Young* when state officials are assisting federal crimes or causing federal officials to violate their rights under RFRA. In addition, the withholding-of-funds remedy in the Coates–Snowe amendment and the Weldon amendment is not accompanied by a "judicially unadministrable" text. *See Armstrong*, 575 U.S. at 328. The state seems to

---

20.   *Seminole Tribe*, 517 U.S. at 73–74.

be arguing that *any* congressionally created remedial scheme precludes resort to *Ex parte Young*,[21] but that stance is incompatible with the limited and carefully described holdings of *Seminole Tribe* and *Armstrong*.

The state also claims that *Ex parte Young* actions may be brought only when a state official is threatening to bring an "enforcement action" or an "action at law." *See* Def.'s Br., ECF No. 26, at 20 (quoting *Planned Parenthood of Indiana, Inc. v. Commissioner of the Indiana State Dep't of Health*, 699 F.3d 962, 983 (7th Cir. 2012)). That is Professor Harrison's theory of *Ex parte Young*,[22] but the Supreme Court had never adopted this view in a majority opinion (although several justices have endorsed it in concurrences or dissents).[23] Neither has the Seventh Circuit. The passages that the state quotes from *Planned Parenthood of Indiana* were dictum, as the Court assumed for the sake of argument that the plaintiff had a cause of action and proceeded to reject its claim on the merits. *See Planned Parenthood of Indiana*, 699 F.3d at 983 ("*[W]e do not need to commit ourselves here*[on the cause of action issue]. Planned Parenthood's preemption claim cannot succeed on the merits. Because our jurisdiction is not at issue, we can assume *without deciding the right-of-action question* and proceed directly to the merits." (emphasis added)). And in *Doe v. Holcomb*, 883 F.3d 971 (7th Cir. 2018), the Court found *Ex parte Young* inapplicable because the state officials had nothing to do with the enforcement of the challenged law. *See id.* at 976–77; *Ex parte Young*, 209 U.S. 123, 157 (1908) ("In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.").

---

21.  Def.'s Br., ECF No. 26, at 21.

22.  John Harrison, *Ex Parte Young*, 60 Stan. L. Rev. 989 (2008).

23.  *See Virginia Office for Protection and Advocacy v. Stewart*, 563 U.S. 247, 262 (2011) (Kennedy, J., concurring); *Douglas v. Independent Living Center of Southern California, Inc.*, 565 U.S. 606, 620 (2012) (Roberts, C.J., dissenting); *Whole Woman's Health v. Jackson*, 595 U.S. 30, 53 (2021) (Thomas, J., concurring in part and dissenting in part)

A litigant who sues under *Ex parte Young* needs only to "allege[] an ongoing violation of federal law and seek[] relief properly characterized as prospective";[24] there is no requirement that he sue in response a threatened legal proceeding or enforcement action that a state officer is preparing to bring against him.

### C. The Plaintiffs May Sue Under The Declaratory Judgment Act To Enforce The Comstock Act, The Coates–Snowe Amendment, The Weldon Amendment, And The Religious Freedom Restoration Act

The Declaratory Judgment Act does not supply an independent basis for federal-question jurisdiction. *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72 (1950); David P. Currie, *Federal Jurisdiction in a Nutshell* 66–67 (4th ed. 1999) ("The Declaratory Judgment Act was not intended to extend the jurisdiction of the District Courts, but only to provide an additional remedy in cases already within their authority."). So if the Court concludes that the plaintiffs lack a cause of action to assert *any* of their claims under 42 U.S.C. § 1983 or *Ex parte Young*, then it should dismiss the requests for declaratory relief under Rule 12(b)(1).[25]

But the state acknowledges that the plaintiffs have a cause of action to assert their constitutional claims under 42 U.S.C. § 1983, so the plaintiffs may seek declaratory relief for each of their statutory-preemption claims under the supplemental jurisdiction. *See* 28 U.S.C. § 1367; *Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 936 (7th Cir. 2008) (claims under the Declaratory Judgment Act may be brought under the supplemental jurisdiction if they "'derive from a common nucleus of operative fact' with the original federal claims"). All of the plaintiffs' claims arise from a common nucleus of operative fact, and there is no basis for declining the exercise of supplemental jurisdiction under the factors listed in 28 U.S.C. § 1367(c). The plaintiffs have therefore shown "the existence of a judicially remediable

---

24. *Verizon Maryland, Inc. v. Public Service Comm'n of Maryland*, 535 U.S. 635, 645 (2002).

25. The plaintiffs cannot use the diversity jurisdiction to salvage their declaratory-judgment claims because the plaintiffs and the defendant are citizens of Illinois.

right,"[26] at least with their constitutional claims, and also with their statutory-preemption claims if this Court allows those claims to proceed under 42 U.S.C. § 1983 or *Ex parte Young*.

The state's claim that the Declaratory Judgment Act "does not create a cause of action" is false. *See Edgewood Manor Apartment Homes, LLC v. RSUI Indemnity Co.*, 733 F.3d 761, 772 n.2 (7th Cir. 2013) ("The Declaratory Judgment Act *provides a cause of action* . . . to those seeking a declaration of their own legal rights." (emphasis added)); *Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 935 (7th Cir. 2008) ("The State, *in its fourth cause of action*, sought a declaration that it has negotiated in good faith with the Nation as required by the IGRA." (emphasis added)). The Declaratory Judgment Act establishes a cause of action that authorizes litigants to seek and obtain declaratory relief; what it does not provide is an independent basis for subject-matter jurisdiction under 28 U.S.C. § 1331. So long as the plaintiffs can establish federal-question jurisdiction with their constitutional claims under 42 U.S.C. § 1983 (and there is no dispute that they have), then they may seek declaratory relief for their statutory-preemption claims under 28 U.S.C. § 2201(a).

## III. The State's Enforcement Of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60 Is Preempted By The Comstock Act, The Coates–Snowe Amendment, The Weldon Amendment, And The Religious Freedom Restoration Act

The state denies that its enforcement of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60 violates any of the federal statutes cited in the second amended complaint, but none of its arguments have merit.

### A. The Comstock Act

The Comstock Act means what it says. It declares that "[e]very article or thing designed, adapted, or intended for producing abortion" is "nonmailable matter," and imposes federal criminal liability on any person who "knowingly uses the mails for the mailing, carriage in the mails, or delivery of" these abortion-related "articles" or "things." 28 U.S.C. § 1461

---

26. *Schilling v. Rogers*, 363 U.S. 666, 677 (1960).

(attached as Exhibit 6). It also imposes criminal penalties on anyone who "knowingly uses any express company or other common carrier or interactive computer service . . . for carriage in interstate or foreign commerce" of "any drug, medicine, article, or thing designed, adapted, or intended for producing abortion." 28 U.S.C. § 1462(c) (attached as Exhibit 6). And it imposes criminal sanctions on anyone who "knowingly takes or receives" a "drug, medicine, article, or thing designed, adapted, or intended for . . . producing abortion" from an "express company or other common carrier or interactive computer service." *Id.* It does not matter whether the sender "intends the items to be used unlawfully under the law of the receiving state." Def.'s Br., ECF No. 26, at 22. And it does not matter whether Illinois permits or prohibits abortion as a matter of state law. *See Bours v. United States*, 229 F. 960, 964 (7th Cir. 1915) ("In applying the national statute to an alleged offensive use of the mails at a named place, it is immaterial what the local statutory definition of abortion is, what acts of abortion are included, or what excluded. . . . Its inclusion in the statute governing the use of the mails indicates a national policy of discountenancing abortion as inimical to the national life."). The only exception that the Seventh Circuit has recognized to Comstock's statutory commands is for the shipment of abortion-related materials needed to save the life of the mother. *See id.* ("Though the letter of the statute would cover all acts of abortion, the rule of giving a reasonable construction in view of the disclosed national purpose would exclude those acts that are in the interest of the national life. Therefore a physician may lawfully use the mails to say that if an examination shows the necessity of an operation to save life he will operate, if such in truth is his real position.").

The Acting Director is aiding or abetting violations of 18 U.S.C. §§ 1461–1462 by enforcing of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60. Every abortion provider in Illinois is obtaining abortion-inducing drugs in violation of federal law, yet the Acting Director is forcing insurers to reimburse the entire costs of these illegally obtained drugs. The state's enforcement of these laws qualifies as: (1) "an affirmative act in furtherance of that offense"; (2) "with the intent of facilitating the offense's commission." *Rosemond v. United States*, 572

U.S. 65, 71 (2014). The plaintiffs do not need to show that the state is forcing *them* to engage in criminal acts;[27] it is enough to show that state officials are violating "the supreme Law of the Land" by enforcing 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60.

### B.    The Weldon Amendment

The Weldon Amendment prohibits the state from discriminating against "any institutional or individual health care entity" that refuses to "provide coverage of . . . abortions." Pub. L. No. 117-103, Div. H, § 507(d), 136 Stat. 49, 496 (2022). The Weldon Amendment defines "health care entity" to include "a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan." Pub. L. No. 117-103, Div. H, § 507(d)(2), 136 Stat. 49, 496 (2022). The state's enforcement of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60 violates the Weldon Amendment by discriminating against health insurers that refuse to cover abortions.

The state does not deny any of this. But it says that the plaintiffs cannot assert this preemption claim because none of the plaintiffs fall within the Weldon Amendment's definition of "health care entities." Def.'s Br., ECF No. 26, at 23 ("[I]nsurance plan beneficiaries and purchasers like Plaintiffs are not protected 'health care entities' as defined in these statutes."). But why should that defeat the merits of the plaintiffs' preemption claim? The Acting Director is violating the Weldon Amendment by discriminating against insurers that refuse to cover abortions, and her violations of the Weldon Amendment are injuring the plaintiffs by depriving them of the ability to purchase a state-regulated health-insurance plan that excludes abortion coverage. Once the plaintiffs allege Article III standing and a cause of action, the *only* remaining question is whether the Acting Director is violating the Weldon Amendment—which she indisputably is.

---

27. *See, e.g.*, Def.'s Br., ECF No. 26, at 23 ("Plaintiffs plead no facts that suggest they specifically intend to further a criminal venture").

### C.      The Coates–Snowe Amendment

The state has a better argument with respect to the Coates–Snowe amendment because its definition of "health care entity" does not explicitly include insurers. *See* 42 U.S.C. § 238n(c)(2) ("The term 'health care entity' includes an individual physician, a postgraduate physician training program, and a participant in a program of training in the health professions."). The only way that the plaintiffs can assert a preemption claim under Coates–Snowe is by relying on the fact that the statutory definition does not purport to limit itself to the individuals and entities described in section 238n(c)(2), and its use of the word "includes" indicates that the categories described in the statute establish the minimum scope rather than the outer boundary of "health care entity." A health insurer qualifies as a "health care entity" under an ordinary understanding of that term, even though it is not explicitly delineated as such in section 238n(c)(2). And an insurer that limits coverage of elective abortions is "refus[ing] to make arrangements" for abortions under 42 U.S.C. § 238n(a)(2). This is an admittedly broad construction of the protections conferred by Coates–Snowe, but it is not a textually impermissible one.

### D.      The Religious Freedom Restoration Act

The state does not deny that its enforcement of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60, when combined with the employer-coverage mandate in the Affordable Care Act, causes the federal government to violate Innovator's statutory rights under the Religious Freedom Restoration Act (RFRA). Yet it insists that Innovator cannot hold the Acting Director responsible for causing and contributing to these violations of RFRA.

The state accuses Innovator of "attempt[ing] to make an end run around *City of Boerne*, which expressly held that federal RFRA cannot be enforced against the States." Def.'s Br., ECF No. 26, at 24. But Innovator is not arguing that state governments must follow the protections for religious exercise that RFRA imposes only on the federal government. It is contending only that state officials may not act in a manner that causes *the federal government*

to substantially burden Innovator's religious exercise in violation of RFRA. There is no contradiction at all between this RFRA preemption claim and the holding of *City of Boerne v. Flores*, 521 U.S. 507 (1997). More importantly, *City of Boerne* did not hold that "RFRA cannot be enforced against States." Def.'s Br., ECF No. 26, at 24. It held only that Congress lacks authority under section 5 of the Fourteenth Amendment to compel states to comply with the free-exercise protections established in *Sherbert v. Verner*, 374 U.S. 398 (1963). *See City of Boerne*, 521 U.S. at 535. Innovator is simply seeking to stop state officials from causing or contributing to the federal government's violations of RFRA, and nothing in *City of Boerne* prevents Innovator from seeking this relief. *See* pp. 19–20, *supra*.

The state also tries to defeat Innovator's preemption claim by touting 42 U.S.C. § 18023(c)(1), which provides that "Nothing in this [ACA] shall be construed to preempt or otherwise have any effect on State laws regarding the prohibition of (or requirement of) coverage, funding, or procedural requirements on abortions." *See* Def.'s Br., ECF No. 26, at 25. But Innovator is not arguing that the ACA or its employer-coverage mandate preempts the state's enforcement of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60. It is federal RFRA that preempts the state's enforcement of these compulsory abortion-coverage laws, because the state's enforcement of those laws, when combined with the federal government's enforcement of the ACA's employer-coverage mandate, causes the federal government to substantially burden Innovator's religious exercise in violation of RFRA.

## IV.  The Plaintiffs Have Alleged A Violation Of Their Free-Exercise Rights

The state argues that its compulsory abortion-coverage laws are "neutral" and "generally applicable," and therefore subject to rational-basis review under *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990). They are nothing of the sort. And even if they were, *Smith* is inapplicable because the organizational plaintiffs are asserting a hybrid-rights claim that invokes both the free-exercise clause and the First Amendment right of expressive association.

A.   **The Exemptions In 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60 Defeat Any Claim That The Abortion-Coverage Laws Are "Generally Applicable"**

The state acknowledges (as it must) that the compulsory abortion-coverage requirements in 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60 are subject to numerous statutory exemptions. Those include:

1.  A statutory exemption for any "multistate plan that does not provide coverage for abortion."[28]

2.  A provision that authorizes the Department of Insurance to grant individualized exemptions to the requirements of 215 ILCS 5/356z.4a or 215 ILCS 5/356z.60 whenever it concludes that the enforcement of these laws "may adversely affect the allocation of federal funds to this State."[29]

3.  A statutory exemption to 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60's no-cost-sharing rule for high-deductible plans if (and only if) the no-cost-sharing arrangement would render that high-deductible plan ineligible for a health savings account under 27 U.S.C. § 223.[30]

4.  A statutory exemption for health-insurance policies that were issued, amended, delivered, or renewed in Illinois before a certain date.[31]

These exemptions defeat any contention that 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60 qualify as "generally applicable" laws. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 533–34 (2021) ("A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individ-

---

28.   *See* 215 ILCS 5/356z.4a(d); 215 ILCS 5/356z.60(f).

29.   *See* 215 ILCS 5/356z.4a(e); 215 ILCS 5/356z.60(g).

30.   *See* 215 ILCS 5/356z.4a(b); 215 ILCS 5/356z.60(d).

31.   *See* 215 ILCS 5/356z.4a(a) (applying only to health-insurance policies "issued, amended, delivered, or renewed in this State after the effective date of this amendatory Act of the 101st General Assembly unless the policy provides a covered person with coverage for abortion"); 215 ILCS 5/356z.60(b) (applying only to health-insurance policies "amended, delivered, issued, or renewed in this State on or after January 1, 2024").

ualized exemptions.'" (citation and some internal quotation marks omitted)); *Tandon v. New-som*, 593 U.S. 61, 62 (2021) ("[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise.").

The state resists this conclusion, claiming that these exemptions are necessary to "'ensur[e] compliance with federal law.'" Def.'s Br., ECF No. 26, at 26 (quoting *Cedar Park Assembly of God of Kirkland, Washington v. Kreidler*, 683 F. Supp. 3d 1172, 1186 (W.D. Wash. 2023)). But none of the exemptions are required by federal law, and none of them are needed to ensure compliance with federal law.

1. Nothing in federal law gives multistate plans an exemption from laws such as 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60. The only provision that comes close is 42 U.S.C. § 18054(a)(6), which provides that "the Director of the Office of Personnel Management shall ensure that with respect to multi-State qualified health plans *offered in an Exchange*, there is *at least one such plan* that does not provide coverage of [non-Hyde abortions]." (emphasis added). But the statutory exemptions for multistate plans extend far beyond this by shielding *any* multistate plan that declines to provide abortion coverage, regardless of whether those non-abortion multistate plans are offered in an exchange, and regardless of whether their decision to exclude abortion coverage was prompted by the OPM Director.

2. A state does not violate federal law by acting in a manner that "may adversely affect" its "allocation of federal funds." It is perfectly legal for a state to act in a manner that provokes federal officials to reduce the state's share of federal subsidies, so long as there is no independent statutory prohibition on the state's conduct. A state that lowers its drinking age to 18, thereby causing the Secretary of Transportation to withhold 10% of the state's federal highway funds, has not violated any federal law. *See* 23 U.S.C. § 158(a)(1)(A) ("The Secretary shall withhold 10 per centum of the amount required to be apportioned to any State under each of sections 104(b)(1), 104(b)(3), and 104(b)(4) of this title on the first day of each fiscal year after the second fiscal year beginning after September 30, 1985, in which the

purchase or public possession in such State of any alcoholic beverage by a person who is less than twenty-one years of age is lawful."). Neither does a state whose abortion-coverage laws lead federal officials to reduce its allotment of federal subsidies, either because a statute requires the withdrawal of federal funds or because federal officials use their discretionary powers to steer money away from states with pro-abortion policies. *Cf.* Emily Badger, *Trump Raises New Threat to Sanctuary Cities: Blocking Transportation Dollars*, New York Times (Jan. 31, 2025), available at http://bit.ly/4j4oyn8. A state that is willing to confer individualized exemptions from its abortion-coverage laws for the sake of money, but is unwilling to make any exceptions or accommodations for religious objectors, is not enforcing a "generally applicable" law under *Fulton* or *Tandon*. *See Fulton*, 593 U.S. at 533–34; *Tandon*, 593 U.S. at 62; *see also Illinois Bible Colleges Ass'n v. Anderson*, 870 F.3d 631, 640 (7th Cir. 2017) ("Neutral and generally applicable laws are still subject to strict scrutiny if . . . the government is allowed to make individualized exemptions from a general requirement.").

3. There is no conceivable federal law that prohibits Illinois from enforcing its abortion-coverage requirements in a manner that renders high-deductible plans ineligible for a health savings account. 27 U.S.C. § 223 simply defines the high-deductible plans that qualify for health savings accounts. It does not require state officials to ensure that these qualifying high-deductible plans can exist within their borders. The statutory exemptions for high-deductible plans have nothing to do with "'ensuring compliance with federal law'";[32] They exist only to ensure that Illinois residents remain eligible for a federal tax benefit. Once again, Illinois is willing to make exemptions and accommodations for the sake of money but not religious freedom, which defeats any claim that its abortion-coverage laws are "generally applicable." *See Fulton*, 593 U.S. at 533–34; *Tandon*, 593 U.S. at 62.

---

32. Def.'s Br., ECF No. 26, at 26 (quoting *Cedar Park*, 683 F. Supp. 3d at 1186).

4. The state does not argue that its exemption for grandfathered health-insurance policies was needed to ensure compliance with federal law. But it describes this not as an "exemption" but rather a "specification" of the date on which the statutes would take effect. *See* Def.'s Br., ECF No. 26, at 27. Yet the fact remains that an insurance policy could avoid the commands of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60 so long as it refrained from amending, delivering, issuing, or renewing itself after the effective statutory dates. The state's willingness to exempt these plans (presumably for reasons of administrative convenience) while refusing to offer any type of accommodation to religious objectors further undermines the state's claim that its abortion-coverage laws are "generally applicable." *See Fulton*, 593 U.S. at 542 (holding that the existence of exceptions "undermines the City's contention that its non-discrimination policies can brook no departures" and faulting the city for "offer[ing] no compelling reason why it has a particular interest in denying an [religious] exception to CSS while making them available to others.").

### B. Plaintiffs Midwest Bible Church, Pro-Life Action League, And Illinois Right To Life Have Alleged A Hybrid-Rights Claim That Renders *Oregon v. Smith* Inapplicable

Even if the state could show that its compulsory abortion-coverage statutes are "generally applicable," they would remain subject to strict scrutiny because the organizational plaintiffs are asserting an expressive-association claim alongside their free-exercise claim. *See Smith*, 494 U.S. at 881–82 ("[D]ecisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections . . . . [I]t is easy to envision a case in which a challenge on freedom of association grounds would likewise be reinforced by Free Exercise Clause concerns"); *Fulton*, 593 U.S. at 598–600 (Alito, J., concurring) ("[M]any claims for religious exemptions can easily be understood as hybrid free-exercise/free-speech claims."). The plaintiffs do not need to assert a winning expressive-association claim to fit within the hybrid-rights exception

to *Smith*, they need only to allege an expressive-association claim that is not "utterly merit-less." *See Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752 (7th Cir. 2003) ("'[A] plaintiff does not allege a hybrid rights claim entitled to strict scrutiny analysis merely by combining a free exercise claim with an utterly meritless claim of the violation of another alleged fundamental right.'" (quoting *Miller v. Reed,* 176 F.3d 1202, 1207–08 (9th Cir. 1999)).

The plaintiffs' expressive-association claim is not "utterly meritless," and we do not understand the state to be arguing otherwise. Although the state is seeking dismissal of the expressive-association claim and describes it as "deficient,"[33] it does not go so far as to denounce the plaintiffs' expressive-association claim as "utterly meritless." Instead, the state seems to be arguing that a hybrid-rights claim should be disallowed whenever a court decides to dismiss the accompanying constitutional claim. *See* Def.'s Br., ECF No. 26, at 30 ("[T]he Court should dismiss Claim 2 under Rule 12(b)(6), *thereby disallowing* Plaintiffs . . . from bringing a hybrid-rights claim with Claim 1." (emphasis added)). But this would mean that a plaintiff could never assert a hybrid-rights claim unless the accompanying constitutional claim would succeed on its own accord, a regime that would make it unnecessary for any litigant to rely on the category of hybrid rights. The sounder approach is to allow a plaintiff to invoke the hybrid-rights exception to *Smith* whenever he combines a free-exercise claim with another constitutional claim that is not "utterly meritless." And the plaintiffs have alleged more than enough to overcome that threshold requirement, even if the Court ultimately decides to dismiss the expressive-association claim under Rule 12(b)(6).

The state does not deny that its enforcement of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60 makes membership in Midwest Bible Church, Pro-Life Action League, and Illinois Right to Life less attractive. *See Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 69 (2006) ("[F]reedom of expressive association protects more than just

---

33.   Def.'s Br., ECF No. 26, at 27.

a group's membership decisions. . . . [L]aws . . . [that]_ma[ke] group membership less attractive . . . rais[e] the same First Amendment concerns about affecting the group's ability to express its message."). And the state does not deny that its enforcement of these laws forces Midwest Bible Church, Pro-Life Action League, and Illinois Right to Life to choose between aiding and abetting abortions, which undercuts the credibility of their anti-abortion message and exposes them to charges of hypocrisy, and refusing to provide health insurance, which makes it difficult for them to recruit and retain employees. Instead, the state argues that the act of purchasing health insurance is "not expressive conduct." Def.'s Br., ECF No. 26, at 29. But that observation does nothing to defeat the organizational plaintiffs' expressive-association claim, because the plaintiffs have specifically alleged that the state is burdening their ability to express anti-abortion messages and to associate with others for that purpose. *See* Second Amended Complaint, ECF No. 19, at ¶ 185 ("Forcing these organizational plaintiffs to pay for abortions as a condition of providing health insurance to their employees *affects in a significant way their ability to advocate those viewpoints*" (emphasis added)). That remains the case regardless of whether the act of purchasing health insurance qualifies as "protected speech" or "expressive conduct." Def.'s Br., ECF No. 26, at 29; *see also Boy Scouts of America v. Dale*, 530 U.S. 640, 653 (2000) ("[W]e must . . . give deference to an association's view of what would impair its expression.").

For similar reasons, the Court should not dismiss the expressive-association claim at this stage of the litigation. The organizational plaintiffs are alleging that the state's enforcement of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60 is impairing their ability to express their message[34] and making membership in their organizations less attractive,[35] and those factual

---

34.  *See* Second Amended Complaint, ECF No. 19, at ¶ 185 ("Forcing these organizational plaintiffs to pay for abortions as a condition of providing health insurance to their employees affects in a significant way their ability to advocate those viewpoints").

35.  *See* Second Amended Complaint, ECF No. 19, at ¶ 186 ("The defendant's enforcement of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60 . . . makes membership in Midwest Bible Church, Pro-Life Action League, and Illinois Right to Life less attractive because these organizations cannot provide health insurance to their employees without making

allegations must be assumed true on a motion to dismiss. *See Christopher*, 536 U.S. at 406 ("Since we are reviewing a ruling on motion to dismiss, we accept Harbury's factual allegations and take them in the light most favorable to her."). Whether the enforcement of these compulsory abortion-coverage laws is actually having these effects is an factual question that should not be resolved on a Rule 12(b)(6) motion. *Priests For Life v. U.S. Dep't of Health and Human Services*, 772 F.3d 229 (D.C. Cir. 2015), is inapposite because the organizational plaintiffs have specifically alleged that the state's enforcement of 215 ILCS 5/356z.4a and 215 ILCS 5/356z.60 impairs their ability to express their message, and those allegations must be assumed true at this stage of the litigation. *Compare id.* at 269 (holding that Priests for Life had failed to allege or prove that the enforcement of the federal contraceptive mandate would "impair its ability to express its message."). *U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588 (6th Cir. 2013), is inapposite for the same reason, as the Court in that dismissed an expressive-association claim because the plaintiffs "failed to show" that the ACA's individual mandate "impair[s] plaintiffs' ability to engage in expressive conduct" or "make[s] group membership less desirable." *Id.* at 600 (citation and internal quotation marks omitted)). The organizational plaintiffs have alleged otherwise, and allegations are all that is needed to defeat a Rule 12(b)(6) motion.

## CONCLUSION

The Court should deny the defendants' Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, as well its Rule 12(b)(6) motion to dismiss for failure to state a claim. If the Court grants the defendants' Rule 12(b)(1) motion, then it should conditionally rule on whether it would have granted the defendants' Rule 12(b)(6) motion. *See* note 17, *supra*.

---

their employees (and their organization) complicit in other people's elective abortions.").

Respectfully submitted.

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL

THOMAS BREJCHA
PETER BREEN
Thomas More Society
309 West Washington Street, Suite 1250
Chicago, Illinois 60606
(312) 782-1680 (phone)
(312) 782-1887 (fax)
info@thomasmoresociety.org

Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Dated: May 12, 2025

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on May 12, 2025, I served this document through CM/ECF upon:

ELIZABETH MORRIS
SARAH J. GALLO
ALICE L. RIECHERS
ELENA S. METH
Office of the Illinois Attorney General
Special Litigation Bureau
115 South LaSalle Street, 35th Floor
Chicago, Illinois 60603
(312) 814-3000
elizabeth.morris@ilag.gov
sarah.gallo@ilag.gov
alice.riechers@ilag.gov
elena.meth@ilag.gov

*Counsel for Defendants*

                     /s/ Jonathan F. Mitchell
                     JONATHAN F. MITCHELL
                     *Counsel for Plaintiff*